UNITED STATES f/u/b/o VENTURE
ELECTRICAL CONTRACTORS, INC.,

        Plaintiff,

    v.                                   Case No. 17-cv-1473-pp

LIBERTY MUTUAL INSURANCE COMPANY,

        Defendant.

## ORDER DENYING PLAINTIFF'S CIVIL L.R. 7(h) EXPEDITED, NON-DISPOSITIVE MOTION TO STRIKE (DKT. NO. 22), GRANTING DEFENDANT'S MOTION TO SET ASIDE DEFAULT (DKT. NO. 11), GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE AN ANSWER (DKT. NO. 12) AND DENYING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT (DKT. NO. 7)

The plaintiff filed this case on October 26, 2017, alleging that the defendant violated the Miller Act, 40 U.S.C. §3131, by failing to pay the plaintiff's bond claim. Dkt. No. 1. On December 4, 2017, the plaintiff filed a motion for entry of default with an executed summons showing that it accomplished service on the defendant on October 31, 2017. Dkt. Nos. 4, 5. The clerk's office entered default that same day, and two days later—on December 6, 2017—the plaintiff filed a motion for default judgment in the amount of $511,591.57. Dkt. No. 7.

On February 27, 2018, the defendant filed a motion to set aside default, dkt. no. 11, and a motion for leave to file an answer, dkt. no. 12. The defendant argued that its own inadvertence had caused its default. The plaintiff

responded by arguing that the defendant had not provided evidence detailing the inadvertence, dkt. no. 18; the defendant replied with a brief and affidavits that further explained how the default occurred, dkt. nos, 19, 20 and 21. On April 12, 2018—nine days after the defendant filed its reply—the plaintiff filed an expedited, non-dispositive Civil Local Rule 7(h) motion asking the court to strike the reply affidavits. Dkt. No. 22.

The court will deny the plaintiff's Civil L.R. 7(h) motion to strike. The defendant has shown good cause for its default, and the court will grant the defendant's motion to vacate default, grant the defendant's motion for leave to file an answer and deny the defendant's motion for default judgment.

## I.    Factual Background

The complaint alleges that on May 1, 2013, defendant Liberty Mutual Insurance Company issued a performance bond on behalf of a company called BW Contracting; the amount of the bond was $7,853,000, and it was issued in connection with BW's work as a general contractor on a project to make improvements at the Milwaukee VA Medical Center. Dkt. No. 1 at ¶7. In August 2013, the United States Department of Veterans Affairs, Great Lakes Acquisition Center and BW Contracting Services, Inc. entered into a contract for BW to be the general contractor on the improvement project. Id. at ¶6. Early in August, BW entered into an agreement with an electrical subcontractor, plaintiff Venture Electrical Contractors, to do some of the electrical work for the project. Id. at ¶8.

According to the plaintiff, the project was delayed several times, but BW required the plaintiff to continue its work regardless. Id. at ¶¶12-17. The plaintiff says that BW never paid it for its delay claims. Id. at ¶17. The complaint alleges that BW Contracting "failed to pay [plaintiff] for amounts due and owing to [the plaintiff] under the Subcontract, independent of the delay claims." Id. ¶19.

On March 2, 2017, the plaintiff sent notice to BW, defendant Liberty Mutual and the Department of Veterans Affairs, giving notice that it had a claim against the performance bond because of BW's failure to pay. Id. at 4, ¶23; Dkt. No. 1-3. Among other things, the letter notified the recipients that the plaintiff would be pursuing "all available legal remedies against BW Contracting, as principal, and [the defendant] as surety, for the bond issued for this Project." Dkt. No. 1-3.

The complaint alleges that in an October 16, 2017 letter, the defendant denied the plaintiff's claim. Dkt. No. 1 at 4, ¶25; see also dkt. no. 1-4. The plaintiff filed this case ten days later, on October 26, 2017. Dkt. No. 1.

## II.    Procedural History

On December 4, 2017, the plaintiff docketed the executed summons. Dkt. No. 4. The summons was addressed to "LIBERTY MUTUAL INSURANCE COMPANY 175 Berkeley Street Boston, Massachusetts 02116;" it was dated October 30, 2017, and notified the recipient that it had twenty-one days after service—sixty days if the defendant was a United States agency—to answer or otherwise respond. Id. at 1. The second page, titled "PROOF OF SERVICE"

3

indicated that a process server had served the summons and complaint on "Tiffany Sullivan, Legal Dept." of "Liberty Mutual Insurance Company, 175 Berkeley Street, Boston, MA 02116" on "10/31/2017 @ 8:57 am." Id. at 2. Given that service date, the defendant's answer was due by November 21, 2017.

The same day that the plaintiff filed the executed summons, it filed a motion for entry of default, dkt. no. 5, accompanied by an affidavit from James J. Irvine, one of the attorneys for the plaintiff, dkt. no. 6. The affidavit, dated December 4, 2017, attested that the defendant had not answered or otherwise responded to the complaint. Dkt. No. 6. The clerk's office entered default on the same day.

Two days later, on December 6, 2017, the plaintiff filed a motion for default judgment. Dkt. No. 7. The motion requested an award of $511,591.57. Id. at 7. Given the court's heavy caseload, the substantial amount of the requested award, and because "district judges should not enter defaults precipitately," Sims v. EGA Products, Inc., 475 F.3d 865, 868 (7th Cir. 2007), the court did not immediately rule on the plaintiff's motion.

On February 27, 2018, the defendant filed a notice of appearance, dkt. no. 10, a motion to set aside default, dkt. no. 11, and a motion for leave to file an answer, dkt. no. 12. The defendant did not argue that service was improper or that the clerk's office should not have entered default; rather, it explained that it had failed to respond to the plaintiff's complaint through inadvertence. Dkt. No. 13 at 3. In support, the defendant filed an affidavit from its Surety

Claims Counsel, Gretchen Eck. Dkt. No. 14. Ms. Eck explained that she was a licensed attorney working at the defendant's office in Hoffman Estates, Illinois, and that she was "responsible for responding to and managing specific surety bond claims that are filed with Liberty by subcontractors that have provided work in connection with construction projects for which Liberty has issued surety bonds." Id. at 1.

Ms. Eck's affidavit referenced the letter from Attorney Irvine dated March 2, 2017, dkt. no. 1-3, as her first involvement in the case, and explained that she responded to Attorney Irvine in a letter on October 16, 2017. Dkt. No. 14 at 2; see also dkt no. 1-4. Ms. Eck asserted that she learned that the plaintiff had filed the complaint on October 30, 2017. Id. She says that she internally inquired as to whether the defendant had been served, and states that "[a]s late as November 29, 2017, I was informed that the docket for this case did not indicate that service had been made on Liberty." Id. Ms. Eck claims that when she continued to internally inquire about the case, she was informed that service had not been accomplished. Id. She attests that she first learned about the defendant's default from the defendant's local Wisconsin counsel, Steven W. Jelenchick, on February 26, 2018. Id. at 3.

Ms. Eck's affidavit states that upon learning of the default, she investigated why she had not received the summons and complaint; she says that under the defendant's internal policies and procedures, "the Summons and Complaint should have been routed to me upon service on Liberty." Id. She discovered that "[d]ue to inadvertence and mistake, and a breakdown of our

internal processes, the Summons and Complaint which was served on Liberty's legal department in Boston, Massachusetts was not routed to me upon service on Liberty." Id. at 4. Finally, Ms. Eck maintained that between March 2, 2017 and October 16, 2017, she and Attorney Irvine had had a number of conversations about the plaintiff's bond claims, but that "neither Attorney Irvine nor any attorney at his office contacted me to inform me that Venture had filed this lawsuit against Liberty and that Venture would be seeking a default judgment against Liberty." Id.

On March 20, 2018, the plaintiff responded to the motion to set aside default, arguing that the court should deny the motion, and attacking Ms. Eck's affidavit. Dkt. No. 18. The plaintiff claimed that Ms. Eck's affidavit (1) "d[id] not explain what happened to the Complaint once it was served on its legal department[;]" (2) provided "no evidence that the [defendant's] legal department forwarded the Summons and Complaint to an employee who did not understand its significance[;]" (3) left the court to speculate as to what actually happened; and (4) "establishe[d] a deliberate choice to ignore a lawsuit that [the defendant] knew existed." Dkt. No. 18 at 8-9.

The defendant filed a reply brief, dkt. no. 19, a second affidavit from Ms. Eck, dkt. no. 21, and an affidavit from Marilyn Finn—a Surety Claims Assistant at the defendant's office in Hoffman Estates, Illinois, dkt. no. 20. Ms. Eck's second affidavit explained that on November 1, 2017, Tiffany Sullivan— the person who accepted service—had uploaded the summons and complaint to the defendant's "CSC database system," which the defendant's legal

6

department uses to keep track of complaints. Dkt. No. 21 at 2. The next day—November 2, 2017—one of the defendant's paralegals "assigned" the summons and complaint to the defendant's surety claims department "via the CSC mailbox system," which "acts like an email inbox where Claims Assistants can receive, assign, and track new litigation matters." Id. That same day, a security claims assistant reviewed the complaint, realized that Eck was the counsel responsible for it, and "responded to the CSC mailbox that she would open the litigation sub-file" for Eck. Id. Eck says, "[h]aving received a response that the litigation sub-file would be opened and routed to the proper Claims Handler, the matter was removed from the CSC mailbox;" she does not say who received the response, or who removed the matter from the mailbox. Id. Regardless, though, she says that the surety claims assistant "failed to go back into ClaimsCenter to open the litigation sub-file and email [Eck] the Summons and Complaint." Id. Because of this error, Eck says, she did not find out that the defendant had been served until February 26, 2018. Id. She later found out that while the assistant had sent an email to the CSC mailbox, saying that she would open the litigation sub-file, "the Summons and Complaint was removed from the CSC mailbox system as completed." Id.

Marilyn Finn's affidavit stated that she was the surety claims assistant who had viewed the summons and complaint in the CSC mailbox. Dkt. No. 20 at 1, 2. She realized that Eck would be responsible for overseeing the litigation. Id. at 2. Finn forwarded the summons and complaint from the CSC email system to "the Claims Inbox in which [she worked]," then moved it out of the

7

inbox "into my own CSC work folder in the Claims Microsoft Outlook System." Id. Because several people work in the systems, Finn says, she "color code[s] the e-mails that [she handles] to denote that they are handled or complete." Id. After that, she would "go into the ClaimsCenter system to set up the litigation sub-file and send an email to the claims Handler notifying him or her of the lawsuit." Id. In this instance, however, she explains that while she had "color coded this litigation as complete and removed the email from the CSC mailbox into [her] completed CSC folder," she "was interrupted" before she had a chance to set up the sub-file and send an email to Eck. Id. When she returned to work after the interruption, she saw that the litigation had been "marked complete on [her] log," without realizing that she had not followed through with opening the litigation file and e-mailing Eck. Id. Finn states that because of her error, Eck did not find out that the defendant had been served until several months later. Id. at 3.

Nine days after the defendant filed its reply and the Eck and Finn affidavits, the plaintiff filed an expedited, non-dispositive motion under Civil Local Rule 7(h), asking the court to strike the declaration of Marilyn Finn, the supplemental declaration of Gretchen Eck and "all facts and statements relying upon those two Declarations in Liberty Mutual's Reply[.]" Dkt. No. 22 at 2. The defendant responded on April 19, 2018. Dkt. No. 23.

## II.     Discussion

### A.     Civil L.R. 7(h) Motion to Strike (Dkt. No. 22)

The plaintiff cited Fed. R. Civ. P. 7 and 12(f) in support of its assertion that the court should strike the affidavits in support of the defendant's reply brief because the affidavits comprise new facts submitted by the defendant to "patch the holes in its original memorandum." Dkt. No. 22 at 2. The plaintiff says that the defendant's opening brief and attached affidavit failed to provide sufficient facts explaining how the defendant erred, simply concluding that the error must have resulted from mistake or inadvertence. Id. The plaintiff cites two cases that chastised litigants for attempting to raise new evidence in a reply brief that they failed to introduce earlier. Id. (citing E2Interactive, Inc. v. Blackhawk Network, Inc., No. 09-CV-SLC, 2010 WL 1981640, at *1 (W.D. Wis. May 17, 2010) and Baugh v. City of Milwaukee, 823 F.Supp. 1452, 1457 (E.D. Wis. 1993)).

The defendant counters that it submitted the Eck and Finn affidavits for the proper purpose—to respond to arguments specifically raised by the plaintiff. Dkt. No. 23 at 2. The defendant says that the plaintiff criticized Eck's original declaration as lacking detail and being generally insufficient; in reply, the defendant submitted affidavits that fleshed out further details surrounding the defendant's handing of the plaintiff's complaint when it first got served. Id. at 3. The defendant also argued that the plaintiff brought the motion to strike under Rule 12(f); it argues that at least one court has held that that rule is "'not appropriate for briefs and affidavits'" because it applies to "pleadings,"

9

and "'briefs and affidavits in support of motions are not pleadings under the Rules.'" Id. at 4 (quoting Alswager v. Rocky Mountain Instrumental Labs. Inc., No. 09-CV-52, 2010 WL 1180620, at *2 (E.D. Wis. 2010)).

The well-settled rule in the Seventh Circuit is that reply briefs are for replying; litigants may not raise new arguments for the first time in a reply brief. Narducci v. Moore, 572 F.3d 313, 324 (7th Cir. 2009); Sommerfield v. City of Chi., No. 06 C 3132, 2012 WL 3779104, at *1 (N.D. Ill. Aug. 31, 2012) ("As the Seventh Circuit has admonished over and over, reply briefs are for replying, not raising new matters or arguments that could and ought to have been advanced in the opening brief"). That said, "where the reply affidavit merely responds to matters placed in issue by the opposition brief and does not spring upon the opposing party new reasons for [granting a motion], reply papers—both briefs and affidavits—may properly address those issues." Baugh, 823 F. Supp. at 1457

The defendant's opening brief in support of vacating the default argued that it had failed to respond to the complaint out of inadvertence and mistake. It stated:

> As detailed in the Declaration of Gretchen A. Eck, Liberty's Surety Claims Counsel, when a summons and complaint is served on Liberty at its corporate offices in Boston, Massachusetts, the pleadings are to then be forwarded to the Business Unit to identify the appropriate Surety Claims Counsel who is responsible for the file. In this instance, the Surety Claims Counsel responsible for Venture's claim was Ms. Eck. However, according to the Eck Declaration, that process was not followed in the instant case and the Complaint was inadvertently not forwarded to Ms. Eck after Liberty was served on October 31, 2017. This was the result of an internal breakdown and mistake and not a willful tactic.

10

Dkt. No. 13 at 4. The plaintiff's response brief attacked those assertions, attacked Eck's affidavit from a variety of angles and ominously asserted that "[i]t is suspect that Liberty Mutual presents Ms. Eck as the only individual within its organization who is competent to understand the legal significance of a summons and complaint." Dkt. No. 18 at 8-9.

The reply brief and attached affidavits rebut these allegations. The plaintiff argued that the defendant did not explain what happened to the complaint once it was served; the reply brief and affidavits provided that explanation. The plaintiff questioned whether anyone other than Eck knew about the summons and complaint; the defendant provided an affidavit from Finn, showing that she knew about it. While it would have been more efficient for the defendant to include the extra details from Eck's second affidavit and from Finn in its opening brief, the defendant filed its opening motion, brief and the first Eck affidavit the day after it discovered that it was in default. Had the defendant waited to compile further details explaining its failings, its argument on the merits of its motion to vacate the default—that it took quick action— would have suffered.

The affidavits submitted with the reply brief provided additional details to arguments and evidence the defendant already had presented. The court will deny the motion to strike those affidavits.

B.    Motion to Set Aside Default (Dkt. No. 11)

The clerk's office entered default on December 4, 2017, based on an affidavit from plaintiff's counsel, James J. Irvine, dkt. no. 6.

The defendant does not argue that the clerk's office should not have entered default. It does not argue that the court does not have personal or subject matter jurisdiction, or that the plaintiff did not effectively serve the defendant. The court is satisfied that it has specific, personal jurisdiction over the defendant given that the plaintiff's claim concerns a performance bond (to which the defendant was a signatory) for work done on a project in Milwaukee, Wisconsin. The court is satisfied that it has subject-matter jurisdiction over the plaintiff's claim that the defendant violated the Miller Act, 40 U.S.C. §3131, a claim which "aris[es] under" federal law. 28 U.S.C. §1331. Finally, the court finds that the plaintiff effectively served the defendant under Rule 4 of the Federal Rules of Civil Procedure. Thus, the court turns to the parties' arguments over whether the defendant defaulted due to inadvertence.

1.   *Analysis under Rule 55(c)*

The court did not grant the motion for default judgment prior to receiving the defendant's motion to set aside default, so it looks to Fed. R. Civ. P. 55(c)—rather than Rule 60(b)—for the motion to vacate default. Parker v. Scheck Mech. Corp., 772 F.3d 502, 505 (7th Cir. 2014); JMB Mfg., Inc. v. Child Craft, LLC, 799 F.3d 780, 792 (7th Cir. 2015) ("[w]ithout a final judgment, though, [litigant's] motion to set aside the default should have been evaluated under Rule 55(c), not under Rule 60(b) as the district court did."). Rule 55(c) allows the court to set aside an entry of default "for good cause." To show good cause, the party seeking to vacate an entry of default must show: "'(1) good cause for the default; (2) quick action to correct it; and (3) a meritorious defense to the

complaint.'" <u>Cracco v. Vitran Exp. Inc.</u>, 559 F.3d 625, 630-31 (7th Cir. 2009) (quoting <u>Sun v. Bd. of Trustees of Univ. of Ill.</u>, 473 F.3d 799, 810 (7th Cir. 2007)). The Seventh Circuit describes the test as a "lenient standard" to be more "liberally applied" in the Rule 55(c) context—as opposed to the Rule 60(b) context—and emphasizes that "our cases articulate a policy of favoring trial on the merits over default judgment." <u>Id.</u>

a.    Good Cause for the Default

The plaintiff attests that the defendant "made the deliberate and unreasonable decision to ignore its obligations" to this case, dkt. no. 18 at 12, and that the defendant "was in a position to timely answer but decided to remain silent.," <u>id.</u> at 5. The plaintiff argued—albeit before receiving the defendant's reply brief—that the defendant never explained what happened to the complaint once it was served on its legal department, instead relying on Eck's "conclusory explanation that 'inadvertence and mistake, and a breakdown of [Liberty Mutual's] internal process' caused Liberty Mutual's default." <u>Id.</u> at 8. The plaintiff notes that Eck's affidavit acknowledged that she became aware of the complaint on October 30, 2017, which, in its opinion, "establishes a deliberate choice to ignore a lawsuit that Liberty Mutual knew existed[.]" <u>Id.</u> at 9. The plaintiff questioned—again, before receiving the defendant's reply brief—why the defendant had not offered affidavits from employees other than Eck, given that the defendant is a sophisticated litigant with employees trained in processing summonses and complaints. Dkt. No. 18 at 9.

The plaintiff also contended that even if the defendant could show some clerical error, such a "routine back-office" problem should not establish good cause for defaulting. Id. at 9-10 (citing Pretzel & Stouffer, Chartered v. Imperial Adjusters, Inc., 28 F.3d 42, 46 (7th Cir. 1994)). Finally, the plaintiff contends that it was under no obligation to inform the defendant of its default, and that while it may have known that Ms. Eck was an employee of the defendant, she was not the defendant's attorney in this case.

Generally, a party can show good cause for its default by convincing the court that "it did not willfully ignore the pending litigation, but, rather, failed to respond to the summons and complaint through inadvertence." Cracco, 559 F.3d at 631; Parker, 772 F.3d at 505. In Sims, Judge Easterbrook articulated that the phrase "good cause" meant "'good cause' for the judicial action, not 'good cause' for the defendant's error[.]" Sims, 475 F.3d at 868. Under Sims, "[d]amages disproportionate to the wrong afford good *cause* for judicial action, even though there is no good *excuse* for the defendant's inattention to the case." Id. (emphasis in original).

Reading these decisions together,[1] the court first looks to the defendant's excuse for the default, then looks to whether there is "good cause" for judicial action to set aside a default, such as when a default judgment would yield an

---

[1] Prior to JMB Mfg. Inc. v. Child Craft, LLC, 799 F.3d 780, 792 (7th Cir. 2015), several district courts observed that the Sims definition of "good cause" appeared to conflict with the Parker definition of "good cause." See Haertle v. Brennan Inv. Grp., LLC, No. 14-CV-1347, 2015 12964670, at *1 (E.D. Wis. June 4, 2015); Yan Fang Jiang v. Hannon Grp., Ltd., No. 14-CV-309-JPS, 2015 WL 541678, at *3 (E.D. Wis. Feb. 10, 2015). Such worries seem to have subsided.

unjust award of damages. See <u>JMB</u>, 799 F.3d at 792 ("As we explained in *Sims*, an entry of default may be set aside for 'good cause' which does not necessarily require a good excuse for the defendant's lapse"); see also <u>Ariens Co. v. Zawilla</u>, No. 12-C-1071, 2013 WL 12192517, at *1 (E.D. Wis. Feb. 6, 2013) ("[e]ven where there is no good excuse for the defendant's inattention to the case, there may be good cause for the judicial action where, for example, declining to grant a motion to vacate would result in a disproportionate or unjust award of damages.").

The defendant has shown that its default resulted from the inadvertent error of one of its surety claims assistants. The Finn and Eck affidavits show that when the case came into the defendant's organizational system after the service of the summons and complaint, it was Finn's responsibility to open a sub-folder on the case and to notify Eck. Finn failed to do so, not because she was ignoring the lawsuit, but because she got interrupted in the middle of her usual process and lost track of which steps she'd completed. No matter how forcefully the plaintiff argues that the defendant willfully ignored the case, the evidence does not show it. The evidence shows that the defendant did not learn of its default—and, by implication, that service had been accomplished—until February 26, 2018. And the reason for that was because Finn made an error in following the defendant's internal coding procedures.

The plaintiff cites <u>Pretzel</u> for the proposition that "'routine, back-office errors do not rank high on the list of reasons for default.'" Dkt. No. 18 at 9 (quoting <u>Pretzel</u>, 28 F.3d at 45). In the years since that 1994 decision, the

Seventh Circuit has continued to apply the Rule 55(c) standard leniently, and has found "good cause" (a) where "although [litigant] should have taken measures to ensure that service of process on its registered agent was forwarded to the appropriate employee, there is no evidence that it acted willfully when it failed to respond to [litigant's] complaint[,]" <u>Cracco</u>, 559 F.3d at 631; and (b) where a party's liability insurer misidentified the complaint as one "to be monitored" rather than "in litigation," <u>Parker</u>, 772 F.3d at 505. The errors in these cases are similar to the defendant's error in this case, where a surety claims assistant misidentified case file as "complete" and never forwarded the complaint to the appropriate employee. There is nothing before the court to contradict the defendant's explanation that the coding error of a surety claims assistant caused the defendant to remain in the dark about this case until February 26, 2017.

The plaintiff argues that Eck admitted to learning that this case existed as of October 30, 2017 and that she checked on the status of service through November 29, 2017. That does not mean that she learned of the failure to answer. Perhaps best practice would have dictated that Eck check the docket of this case periodically—had she checked the docket after December 4, 2017, she would have realized the error. Failure to engage in best practices, however, does not show that Eck willfully disregarded the case.

On the subject of best practices, the plaintiff insists that it had no obligation to inform Eck that the defendant had not filed an answer. The parties' submissions show that they were familiar with each other before this

litigation started—the plaintiff had addressed a letter to Eck regarding its claims, and had received a letter from Eck denying their claims. See Dkt. Nos. 1-3, 1-4. Counsel for the plaintiff knew the identity of a lawyer for the defendant—Eck—who was familiar with the plaintiff's claims. As the defendant notes, Standard 18 of the Standards for Professional Conduct within the Seventh Federal Judicial Circuit states that "we will not cause any default or dismissal to be entered without first notifying opposing counsel, when we know his or her identity." While Eck may have been in-house counsel for the defendant, as opposed to "opposing counsel" (presumably the plaintiff means litigation counsel), best practice would have been to notify her of the defendant's default—even if the exact language of Standard 18 does not mandate it. This is a case where a simple professional courtesy could have saved everyone—the parties and the court—time and money.

Finally, even if the defendant had not shown a good excuse for its default, the court concludes that good cause exists for judicial action. In Sims, the Seventh Circuit reasoned that a district court could find good cause to vacate the default where the judgment would result in a sanction disproportionate to the extent of the defendant's mistake. Sims, 475 F.3d at 868. "[D]elay that imposes slight injury does not call for multi-million-dollar awards." Id. at 869. The plaintiff seeks a default judgment in excess of $500,000—not a paltry sum by any means, and an award that would be disproportionate for the filing error made by the surety claims assistant. This is especially true where the plaintiff has not identified any prejudice it has

suffered as a result. The Seventh Circuit favors trial on the merits rather than default, and the court sees no reason to deviate from that policy here.

> b. Quick Action to Correct

The defendant next must show quick action to correct the default. <u>Cracco</u>, 559 F.3d at 630. "Evaluating the speed with which a party seeks to set aside an entry of default is a context-specific inquiry that requires the Court to consider the 'possible prejudice' to the plaintiff." <u>Dunn v. GJI, Inc.</u>, No. 1:16-cv-03276-RLY-MJD, 2017 WL 3328129, at *3 (S.D. Ind. June 28, 2017) (citing <u>JMB Mfg. Inc.</u>, 799 F.3d at 792-93).

The plaintiff argues that the defendant waited "approximately eighty days to act on an entry of default that was publicly available via PACER" and that such delay was unreasonable. Dkt. No. 18 at 15. The plaintiff points to Eck's acknowledgment that she knew about the case on October 30, 2017, and says that "it was unreasonable for Liberty Mutual to wait to appear or file an answer until Venture filed proof of service." <u>Id.</u> The plaintiff does not assert that it suffered any prejudice as a result of the alleged two-and-a-half-month delay.

The defendant—specifically Eck—attests that she learned about the defendant's default in this case on February 26, 2018. Dkt. No. 14 at 3, ¶9. The very next day, the defendant filed this motion to set aside default, a motion for leave to file an answer, two affidavits, a disclosure statement and a brief supporting its motions. Dkt. Nos. 10-16. That is quick action indeed; only a same day filing could have been quicker. While the plaintiff is correct that the defendant did not act on the default until eighty days after the clerk entered

the default, the entry of default can't be the trigger for the defendant's action if the defendant isn't aware of it. The starting point for measuring "quick" action is the date the party became aware that it was in default. Here, the defendant acted to remedy its default within one day.

c.      Meritorious Defense to the Complaint

Finally, the defendant must show a meritorious defense to the complaint, which "mean[s] more than bare legal conclusions, but less than a definitive showing that the defense will prevail." Parker, 772 F.3d at 505.

The plaintiff says that the defendant has not shown a meritorious defense, because while the defendant provided Eck's October 16, 2017 letter denying the plaintiff's claims, it did not provide an affidavit saying that the claims in the letter were accurate, or show that Eck had any firsthand knowledge of the VA project. Dkt. No. 18 at 17.

The defendant has met the low standard for the meritorious defense prong. In its brief in support of its motion to vacate default, the defendant asserts the following defenses:

- Liberty's principal, BW, has disputed Venture's claims in their entirety;

- Most of Venture's claims pertain to its subcontractor, Systec, who was paid by Venture's own bonding company, Ohio Casualty, not Venture;

- Regarding one of Venture's delay claims, an independent consultant determined that a reduced amount was owed, which was then subsequently accepted by Venture in settlement;

19

- Venture was terminated by BW, which resulted in back-charges to Venture;

- Venture actually owes BW $32,156.20; and

- Liberty's principal, BW, denied essentially identical in the Federal Companion Lawsuit.[2]

Dkt. No. 13 at 6-7. The defendant says that it presented these defenses after a "careful review of the materials submitted by Venture with its bond claim and an independent investigation by Liberty, including obtaining information from its principal, [BW]." Id. at 7.

These are more than bare legal conclusions. The court does not know whether any of these defenses would prevail, but that is not the test; the court does not judge the veracity of the defendant's claims at this stage. The defendant has shown a meritorious defense consisting of more than bare legal conclusion.

As for the plaintiff's argument that Eck did not attest that the claims in the October 16, 2017 letter were true and correct, the court cannot leap to the conclusion that, with this omission, the defendant cannot present a meritorious defense. In fact, one of the October 16 letter's contentions—that another federal case exists in which Venture has sued BW over the same set of occurrences—can be corroborated by the court. In Ohio Cas. Ins. Co. v. Venture Electrical Contractors Inc. et al., Case No. 17-cv-416-LA (E.D. Wis),

---

[2] The Companion Federal Lawsuit is Ohio Cas. Ins. Co. v. Venture Electrical Contractors Inc. et al., Case No. 17-cv-416-LA (E.D. Wis). The defendant "believes that this matter should be consolidated with the Companion Federal Case so that all issues are address in one forum." Dkt. No. 10 at 7. There is no consolidation motion pending in 17-cv-416, the first-filed case.

BW appears as a third-party defendant in Venture's third-party complaint.

Case No. 17-cv-416, dkt. no. 16.

C.    Motion For Leave To File Answer (Dkt. No. 12)

Under Federal Rule of Civil Procedure 6(b)(1)(B), the court may extend

the time for a party to file its answer on motion made after the time has expired

"if the party failed to act because of excusable neglect." Fed. R. Civ. P.

6(b)(1)(B). The Supreme Court elaborated that the inquiry under "excusable

neglect" is

> at bottom an equitable one, taking account of all relevant
> circumstances surrounding the party's omission. These include . .
> . the danger of prejudice to the [nonmoving party], the length of the
> delay and its potential impact on judicial proceedings, the reason
> for the delay, including whether it was within the reasonable
> control of the movant, and whether the movant acted in good faith.

Pioneer Inv. Serv.'s, Co. v. Brunswick Assoc.'s Ltd. P'ship., 507 U.S. 380, 395

(1993). "Although inadvertence, ignorance of the rules, or mistakes construing

the rules do not unusually constitute 'excusable' neglect, it is clear that

'excusable neglect' under Rule 6(b) is a somewhat 'elastic concept' and is not

limited strictly to omissions caused by circumstances beyond the control of the

movant." Id. at 392. "As a practical matter, vacating entry of default would

serve little purpose without granting defendants leave to file an answer."

Haertle v. Brennan Inv. Grp., LLC, No. 14-CV-1347, 2015 WL 12964670, at *2

(E.D. Wis. June 4, 2015).

The court has accepted the defendant's explanation for its failure to

timely answer. The defendant sought leave to file its answer the day after

learning of its default, and the plaintiff has not demonstrated that it has

suffered any prejudice due to the default. The court finds that defendant's neglect was excusable, and will grant the defendant's motion for leave to file an answer.

D.   Motion for Default Judgment

Because the court has decided to grant the defendant's motion to set aside default, the court will deny the plaintiff's motion for default judgment.

## III.   Conclusion

The court **DENIES** the plaintiff's Civil L.R. 7(h) motion to strike the defendant's reply affidavits. Dkt. No. 22.

The court **GRANTS** the defendant's motion to set aside default. Dkt. No. 11.

The court **ORDERS** that the clerk's office shall **VACATE** the December 4, 2017 entry of default.

The court **GRANTS** the defendant's motion for leave to file an answer. Dkt. No. 12. The court **ORDERS** that the defendant shall file its answer as a separate docket entry no later than the end of the day on **September 7, 2018.**

The court **DENIES** the plaintiff's motion for default judgment. Dkt. No. 7.

Dated in Milwaukee, Wisconsin this 29th day of August, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**